No. 89,934

IN THE MATTER OF THE APPEAL OF THE CITY OF WICHITA FROM
AN ORDER OF THE DIVISION OF TAXATION ON AN ASSESSMENT
OF SALES/USE TAX.

(86 P.3d 513)

Opinion filed March 19, 2004.

*Brian K. McLeod,* assistant city attorney, argued the cause, and *Gary Rebenstorf,* city attorney, and *Richard D. Greene,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, were with him on the brief for appellant.

*John Michael Hale,* of Legal Services Bureau, Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The City of Wichita (City) appeals the decision of the Kansas Board of Tax Appeals (BOTA) affirming the Kansas Department of Revenue's (Revenue Department) assessment of sales tax, compensating use tax, and interest for transactions by the water utility department (water department). The City additionally appeals BOTA's denial of attorney fees and the issuance of a protective order regarding internal Revenue Department documents. We affirm.

## Procedural History

The Revenue Department conducted an audit of the City for the period of June 1, 1992, through May 31, 1995, and the notice of assessment of retailer's sales tax, compensating use tax, and interest was issued on February 5, 1996. The City appealed the assessment on April 1, 1996, requesting a hearing pursuant to the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.* The Secretary of Revenue's designee, Douglas Hager, conducted an administrative hearing beginning on March 27, 1997. On December 29, 1997, Secretary of Revenue Karla Pierce determined that the case should be stayed pending the resolution of the case of *In re Appeal of Water District No. 1 of Johnson County,* 26 Kan. App. 2d 371, 988 P.2d 267, *rev. denied* 268 Kan. 846 (1999), because it contained similar issues to those in this case.

On September 29, 1998, Hager wrote to the City's counsel advising of the recent amendments contained in K.S.A. 79-2975, which required that a "written final determination" should be issued on or before October 1, 1998. Hager asked the City if it

wanted a final written determination issued prior to the conclusion of *Johnson County*. The City responded that it was requesting a final written determination on all other issues in this case, even if the primary issue would be resolved by *Johnson County*.

The Secretary scheduled final arguments in the case for January 14, 1999, before the issuing of a determination. On February 11, 1999, Hager bifurcated the case and issued a summary final determination upholding the assessment of sales tax on electricity purchased to pressurize water in the City's water distribution system. The parties agreed to have this sole issue decided because it related to the pending *Johnson County*. The appeal regarding this issue was ultimately decided by this court in *In re Tax Appeal of City of Wichita*, 274 Kan. 915, 59 P.3d 336 (2002) (*City of Wichita I*).

The remaining issues, relating to the assessment of sales tax, compensating use tax, and interest relating to the City's water department, were decided in a final written determination on June 30, 2000, by Hager's successor, David Heinemann. Heinemann upheld the Revenue Department's assessments and interest and denied the City's request for attorney fees. The City appealed this final determination to BOTA.

BOTA conducted a de novo hearing on the matter in October 2001. On June 14, 2002, BOTA entered an order affirming the assessment of sales tax on certain water department fees and interdepartmental transfers and compensating use tax on computer hardware and related equipment. BOTA denied the City's requests for an abatement of interest and for attorney fees. On November 13, 2002, BOTA issued an order on reconsideration upholding all of its original findings. The City appeals from the BOTA decision, and this court transferred the appeal from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Standard of Review

BOTA is considered the paramount taxing authority in Kansas: however, if BOTA's interpretation of law is erroneous as a matter of law, appellate courts will take corrective steps. *City of Wichita I*, 274 Kan. at 923.

"Tax exemption statutes are to be construed in favor of imposing the tax and against allowing an exemption. However, the taxing statutes will be construed favorably to the taxpayer where there is a reasonable doubt as to the meaning of the statutes." 274 Kan. 915, Syl. ¶ 3.

K.S.A. 77-601 *et seq.* sets forth our scope of review. See K.S.A. 74-2426(c). K.S.A. 77-621(a) provides that "[e]xcept to the extent that this act or another statute provides otherwise: (1) The burden of proving the invalidity of agency action is on the party asserting invalidity." K.S.A. 77-621(c) further specifies that this court may grant relief in the following cases:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

Interpretation of statutes is a question of law; thus, to the extent statutory interpretation is required in this case, our review is unlimited. *City of Wichita I*, 274 Kan. at 924.

## Interdepartmental Transfers

The City's internal auditor from 1994 to 2001, Jeanne Hernandez, testified that the various operating departments of the City, including the water department, shared services for the sake of efficiency. The data center fully costs itself, and then those charges are allocated to the user department for those services. This transaction occurs as a journal entry in the financial accounting system where it is an allocation of those expenses to the water department.

The City argues that BOTA erred in concluding that the following four categories of interdepartmental transfers were taxable:

| "Interdepartmental Transfers | Tax |
| --- | --- |
| Data Center Charges | $37,692 |
| PBX Instrument Charges | $ 5,256 |
| Long Distance Pagers | $ 1,728 |
| Photocopy Charges | $ 972" |

Data center charges were characterized as payments for professional services such as billing, accounting, training, personnel, and payroll and for purchases of equipment or other tangible personal property by the City.

The PBX instrument charges are the instrument charges for phones, actual phone lines, and equipment for the water department. The long distance pagers charges were allocations for pager and long distance services. The photocopy charges are accumulated by the data center's dictionary stores and its operation and allocated to the individual departments. Any equipment purchased in connection with these charges is purchased by the data center, and the cost is transferred to the water department.

Some of the expenses constitute a monthly, recurring charge, which is not recalculated each month and is simply an automated journal entry in the accounting system that transfers the expense to the water department. Some charges, like photocopying and long distance services are not automated charges and are calculated each month based on actual use. Money does not change hands, as the water department has an account number in the accounting system to which the expenses are charged. As the water department does not have its own separate bank account, the money collected from customers, *i.e.*, the receipts from selling and furnishing of water, are deposited into the City's bank account. The expenses attributable to the water department are then noted as accounting debits and credits.

When the allocations to the water department are made, the bundle of costs for the data center charges are classified in the following categories: equipment charges, including software application fees for software such as the payroll and billing software

utilized by the water department; replacement reserves for future purchases of equipment; license fees; personnel; training services; and strategic planning. When asked if the Revenue Department's audit made any effort to segregate these costs based on their taxability, Hernandez responded that the Revenue Department took out all of the labor services from the interdepartmental transfers but did not make an effort to segregate any of the other costs listed.

BOTA concluded that the interdepartmental transfers constituted taxable sales:

"62. The Board finds that the subject 'interdepartmental transfers' as they are referred to by the parties constitutes sales of tangible personal property or services. Although the consideration was recorded by journal entry, the Board finds that there was an exchange of tangible personal property for a consideration.

"63. The Board finds that implicit in K.A.R. 92-19-72 is the fundamental assumption that the initial purchase by the single legal entity is subject to sales tax or that all the various departments are independently exempt from sales tax. Administrative rules and regulations must be appropriate, reasonable, and not inconsistent with the law to be valid. *Pemco, Inc. v. Kansas Department of Revenue*, 258 Kan. 717, 720, 907 P.2d 863 (1995). To interpret K.A.R. 92-19-72 to allow a city to purchase property and services exempt from sales tax and then simply transfer the property to a taxable department, such as the water department, would be inconsistent and unreasonable with the law of K.S.A. 79-3606(b), and amendments thereto. As a result, the Board concludes that the subject 'interdepartmental transfers' are taxable, and the Department's assessment is sustained.

"64. The Board notes that if it were to adopt the Taxpayer's assertion that the interdepartmental transfers were not 'sales,' the initial exempt purchases by the City may need to be evaluated to determine whether they were properly exempt pursuant to K.S.A. 79-3606(b), and amendments thereto. Based upon the facts presented, the property and services were used or proposed to be used in part by the political subdivision in the business of furnishing waters to others. Pursuant to K.S.A. 79-3606(b), the initial purchases by the City may not be exempt from sales tax. The Board does not believe that this is the result intended by the Taxpayer."

## Discussion

The City argues that BOTA's conclusions were erroneous because the assessed transactions do not constitute "sales" as defined by K.S.A. 1992 Supp. 79-3602(c). The City contends the transactions do not involve the exchange of property for consideration;

the transactions would not be considered taxable if made within any other single legal entity under K.A.R. 92-19-72; and BOTA viewed the tax imposition statue with an apparent bias in favor of taxation rather than in favor of the taxpayer, as no statute imposes tax on allocations of shared costs within a single legal entity.

K.S.A. 1992 Supp. 79-3606(b)(2) provides that the following is exempt from tax imposed by the Kansas Retailers' Sales Tax Act:

"(b) all sales of tangible personal property . . . purchased directly by the state of Kansas [or] a political subdivision thereof . . . and used exclusively for state [or] political subdivision . . . purposes, except when . . . (2) such political subdivision is engaged or proposes to engage in the business of furnishing gas, water, electricity or heat to others and such items of personal property or service are used or proposed to be used in such business."

K.S.A. 1992 Supp. 79-3602(c) defines "sales" in relevant part:

" 'Sale' or 'sales' means the exchange of tangible personal property, as well as the sale thereof for money, and every transaction, conditional or otherwise, for a consideration, constituting a sale, including the sale or furnishing of electrical energy, gas, water, services or entertainment taxable under the terms of this act and including, except as provided in the following provision, the sale of the use of tangible personal property by way of a lease, license to use or the rental thereof regardless of the method by which the title, possession or right to use the tangible personal property is transferred."

The regulation corresponding to the K.S.A. 1992 Supp. 79-3606(b) exemption is found at K.A.R. 92-19-76(d):

"The exemption from sales tax for political subdivisions applies only to the extent the political subdivision is not engaged nor proposes to engage in the business of furnishing gas, water, electricity or heat to others and the tangible personal property or taxable services are used or proposed to be used in such business. When a political subdivision is engaged or proposes to engage in furnishing any of these four businesses, the political subdivision shall pay sales tax on all purchases of tangible personal property and taxable services used in these businesses. Nothing under this section of the act shall be construed to limit other exemptions which may be available to a political subdivision which furnishes gas, water, electricity or heat."

The City first argues the transaction did not involve the exchange of property for consideration because the assessments were not made on the initial purchase of property or services by the political subdivision, were not made on each use or value of use made by

the water department of political subdivision property or services, and were not made on the purchase of the equipment or materials used.

The Revenue Department responds that it only taxed a percentage of the interdepartmental transfers that reasonably reflected what tangible personal property and taxable services the water department received from the City. Before figuring this percentage, the Revenue Department took the total data center charges and took out nontaxable items such as personnel and labor services in order to tax only those charges to the water department which were taxable.

Other than citing K.A.R. 92-19-72, which is discussed below, the City has provided no authority that a sale only occurs when the property or service is initially purchased, and the K.S.A. 1992 Supp. 79-3602(c) definition of sale does not include this requirement. Photocopying and long distance charges were calculated based on each use by the water department, and the remaining charges, while primarily fixed, were allocated among the departments which used them. Contrary to the City's assertion, its own internal auditor testified that the data center charges included purchases of equipment and other tangible personal property.

The water department receives this equipment, property, and services, and in exchange the expense is applied to the water department account. Each department within the City has an annual budget. Although the accounting records for the water department are not readily available, it would seemingly follow that these expenses would then be subtracted from its budget. As such, the City's argument that the transaction did not involve the exchange of property for consideration fails.

The City next argues the transactions would not be considered taxable if made within any other single legal entity under K.A.R. 92-19-72. The City argues that the taxable or nontaxable nature of the entities involved was irrelevant to the issue of whether a sale had occurred. The Revenue Department responds that the City's interpretation of K.A.R. 92-19-72, which would allow the City to buy everything tax free and transfer it to the water department tax free, would erroneously violate K.S.A. 1992 Supp. 79-3606(b).

K.A.R. 92-19-72(a), Retail Sales Between Related Entities, provides: "Each interdepartmental transfer of tangible personal property and taxable services between various departments of a single legal entity shall not constitute a sale subject to sales tax." The parties in this case have stipulated that the City, together with its various departments including the water utility, is a single legal entity.

In interpreting administrative regulations, appellate courts are to grant considerable deference to an agency's interpretation of its own regulation, which should not be disturbed unless that interpretation is clearly erroneous or inconsistent with the regulation. *Murphy v. Nelson*, 260 Kan. 589, 595, 921 P.2d 1225 (1996).

Administrative regulations have the force and effect of law. They are presumed to be valid, and one who attacks them has the burden of showing their invalidity. To be valid, rules or regulations of an administrative agency must be within the statutory authority conferred upon the agency and must be appropriate, reasonable, and not inconsistent with the law. Those rules or regulations that go beyond the statutory authorization violate the statute, or are inconsistent with the statutory powers of the agency have been found void. *Pemco, Inc. v. Kansas Dept. of Revenue*, 258 Kan. 717, 720, 907 P.2d 863 (1995).

In order to determine whether K.A.R. 92-19-72(a) is consistent with the statutory authority set forth in K.S.A. 1992 Supp. 79-3606(b)(2), it is necessary to consider the entire circumstances of the situation, including whether the entity paid tax on the initial purchase. Otherwise, as BOTA concluded, the City would be able to utilize K.A.R. 92-19-72(a) to purchase everything exempt from taxation and circumvent the specific statutory authority of K.S.A. 1992 Supp. 79-3606(b), which states that purchases for the water department are taxable. BOTA's interpretation of the regulation prevented it from being declared void.

As discussed above, the transactions between the City and its water department constituted exchanges of property for consideration, or sales. As BOTA pointed out, it is unlikely that the City would like for the initial exempt purchases (often purchases for all of the City's departments) to be evaluated as to whether they

should really be exempt under K.S.A. 1992 Supp. 79-3606(b)(2), as the property and services were used in part by the political subdivision in the business of furnishing water to others. In *City of Wichita I*, this court found that purchases of electricity by the City which were used for both exempt and nonexempt purposes under K.S.A. 1992 Supp. 79-3606(b)(2) should not be prorated because they were used for purposes which were expressly nonexempt under law. See 274 Kan. at 933-36.

Based on this analysis, the City's final argument that BOTA viewed the imposition statute with an apparent bias in favor of taxation because no statute imposes tax on such allocations fails. K.S.A. 1992 Supp. 79-3606(b)(2) exempts from sales tax the tangible personal property purchased directly by a political subdivision and used exclusively for political subdivision purposes, except when such political subdivision is engaged or proposes to engage in the business of furnishing water. As discussed above, the "interdepartmental transfers" at issue clearly constituted an exchange of property for consideration to the taxable water department. This conclusion prevents K.A.R. 92-19-72(a) from being construed to violate K.S.A. 1992 Supp. 79-3606(b)(2) and being declared void. Giving proper deference to the agency's interpretation of this regulation, BOTA's determination that these transfers were taxable under K.S.A. 1992 Supp. 79-3606(b)(2) is upheld.

## Water Department Fees

BOTA sustained the Revenue Department's assessment of six categories of water department fees as follows: (1) turn on/turn off fees—$3,315; (2) account origination fees—$11,580; (3) lawn connect fees—$372; (4) plant equity fees—$8,078; (5) fees in lieu of special assessments—$1,434; and (6) priority service charges—$733.

These fees were described by the City's director of the water and sewer departments, David Warren. The turn on/turn off fees are for the actual physical service of going to a location and physically turning on the curb stop that allows the flow of water from the City's water system through the meter and into the residence or business. This fee covers part of the cost of the personnel, the

vehicle, and the equipment involved in carrying out that service. Lawn connect fees are essentially a turn on and turn off fee for a lawn meter or a lawn irrigation account.

Priority service charges were established for customers who want a turn on or turn off at a certain time. The account origination fee is a charge to a new customer for setting up a new account, and the physical aspect of originating that account occurs at city hall.

The plant equity fee is a contribution of capital from a new customer to recover part of the cost of the backbone facilities, which includes the water treatment plant, major transmission lines, and development of sources of supply. Oftentimes this fee is paid by a builder or developer in cases of new development, and the furnishing of water usually occurs after title has passed to the next builder or homeowner.

The fee in lieu of specials is also a capital recovery fee that relates to facilities such as the sewer main or water distribution line that are immediately adjacent to the property being served. If a person lives in a benefit district, the person would pay special assessments that directly pay for the facilities that are serving the property. If an owner of adjacent property that is not included in the benefit district wanted to connect to the existing line, this owner would have to make payments in lieu of special assessment to represent an equal share in the cost of that plan that has already been paid by others. Hernandez indicated that this fee could be passed on to the home buyer by being embedded in the lot price or the home price, or billed directly by the water department or the developer.

Warren testified that the turn on/turn off fees, the account origination fees, and the lawn connect fees are not included in the gross receipts from the sale of water, that water is not furnished with the payment of these fees, that the fees show up as a separate fee on the customer's bill, and that the payment of the fee does not pass title to any personal property. However, the fees are all reflected on one bill, and if the customer fails to pay the fee(s), the water department will forfeit the customer's deposit and eventually disconnect the customer's water supply.

The plant equity fee and the fee in lieu of special assessment are one time fees paid to obtain water. The plant equity fee is

usually paid by a builder or developer at the time it makes an application to connect a new development to the City's infrastructure. If the developer did not pay the plant equity fees, the City would either not provide a water hookup or disconnect the water supply.

BOTA concluded that these fees were taxable gross receipts:

"53. Sales tax is imposed on the gross receipts from the sale or furnishing of water. K.S.A. 79-3603(c). In other words, sales tax is imposed on the total selling price or total cost to a consumer for the sale or furnishing of water. Ordinary words are to be given their ordinary meaning. *Director of Taxation v. Kansas Crude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984). The Board is not persuaded by the Taxpayer's argument that the occurrence of actual, simultaneous, and physical delivery of water is required for the fees to be included in the gross receipts from the sale or furnishing of water.

"54. The Kansas Court of Appeals in *Newton Country Club* adopted the 'mandatory-voluntary test' and found that mandatory gratuities were subject to sales tax pursuant to K.S.A. 79-3603(d) which assessed 'the gross receipts from the **sale** of meals or drinks.' (Emphasis added.) The mandatory gratuities were for the benefit of the employees of the taxpayer for their services rendered, not for the actual meals or drinks. The Board finds that the charges and fees at issue in this matter are similarly required to be paid in order to receive water from the Taxpayer. If a customer does not pay these fees, the Taxpayer will eventually discontinue service. In this situation, the Board finds that the consumer or account holder is required to pay these fees in order to establish or main its water service, and thus, these fees are taxable pursuant to K.S.A. 79-3603(c), and amendments thereto.

"55. Like the franchise fees in *Atchison Cablevision*, the subject fees should be part of the rate structure of the water department or could be a separate charge. Merely by making these fees separate charges on the itemized bill, the Board finds that the Taxpayer has not removed these fees from the total cost to its consumers.

"56. Further, the Board is not persuaded by the Taxpayer's argument that in many cases persons and entities, such as developers and builders, pay these fees, but never intend to purchase water for the location where the fees were charged. The Board does not believe that a unity of the payor of the fees to establish water service and the ultimate consumer of the water is required. The Board concludes that the Department's assessment is sustained."

## Discussion

The City argues BOTA erred in concluding that water department revenue from providing services and infrastructure was taxable pursuant to K.S.A. 1992 Supp. 79-3603(c).

K.S.A. 1992 Supp. 79-3603(c) imposes a retail sales tax on "the gross receipts from the sale or furnishing of gas, water, electricity and heat, which sale is not otherwise exempt from taxation under the provisions of this act, and whether furnished by municipally or privately owned utilities." This statute was subsequently amended to include the following additional language:

"[B]ut such tax shall not be levied and collected upon the gross receipts from: (1) The sale of a rural water district benefit unit; (2) a water system impact fee, system enhancement fee or similar fee collected by a water supplier as a condition for establishing service; or (3) connection or reconnection fees collected by a water supplier." K.S.A. 2003 Supp. 79-3603(c).

However, K.S.A. 1992 Supp. 79-3603(c) controls.

K.S.A. 1992 Supp. 79-3602(c) defines sale as "the exchange of tangible personal property . . . including the sale or furnishing of electrical energy, gas, water, services or entertainment taxable under the terms of this act." K.S.A. 1992 Supp. 79-3602(h) defines gross receipts as "the total selling price or the amount received as defined in this act, in money, credits, property or other consideration valued in money from sales at retail within this state; and embraced within the provisions of this act." " 'Selling price' means the total cost to the consumer exclusive of discounts allowed and credited, but including freight and transportation charges from retailer to consumer." K.S.A. 1992 Supp. 79-3602(g).

In *In re Appeal of Newton Country Club Co.*, 12 Kan. App. 2d 638, 753 P.2d 304 (1988), the Court of Appeals considered whether mandatory gratuities charged to customers on the sales of food and liquor in the club's restaurant and bar were subject to sales and excise tax because they were part of the club's gross receipts under K.S.A. 79-3603(d) and K.S.A. 79-41a02. The amount of the mandatory gratuity was listed separately on each ticket, the gratuities were pooled, and the club distributed the gratuities to its employees based on the number of hours they worked each week.

On appeal, the Court of Appeals adopted a mandatory-voluntary test in concluding that under the plain language of the statutes, mandatory gratuities were subject to sales and excise tax. It reasoned:

"The sales tax is imposed on the 'gross receipts,' defined as the 'selling price or the amount received . . . from sales at retail within this state.' K.S.A. 79-3602(h). 'Selling price,' in turn, is defined as the 'total cost to the consumer.' K.S.A. 79-3602(g). Here, the customer is required to pay a mandatory gratuity as part of the monthly billing for food and drinks. As such, this mandatory gratuity is part of the 'total cost to the consumer' and is taxable. The excise tax is imposed upon 'gross receipts,' defined as 'the amount charged the consumer for a drink containing alcoholic liquor.' K.S.A. 79-41a01(c). Here again, the mandatory gratuity must be paid on each drink purchased and is therefore part of the 'amount charged for a drink' and taxable." 12 Kan. App. 2d at 644.

In *In re Tax Appeal of Atchison Cablevision*, 262 Kan. 223, 936 P.2d 721 (1997), this court considered whether cable television franchise fees which were passed on to subscribers and listed as a separate charge on the bill were part of the total selling price of the cable television service and, thus, taxable as part of the gross receipts received by the cable operator.

Relying on *Newton Country Club*, this court reasoned that because the franchise fee was a mandatory part of the bill, the fee was part of the gross receipts subject to the sales tax. The court rejected Cablevision's strict construction argument that 79-3603 did not contain authority to impose sales tax on a pass-through franchise fee, reasoning that nowhere in the statute was there authority to impose sales tax on mandatory gratuities tacked onto bills, yet the *Newton Country Club* court found these gratuities were taxable under the plain language of the statute. *Atchison Cablevision*, 262 Kan. at 230.

The court found that the fees were part of the "total cost to the consumer" under K.A.R. 92-19-46, and the regulation clearly intended to include within gross receipts whatever the customer must pay in order to receive cable services. 262 Kan. at 230. It reasoned that the franchise fee was nothing more than a cost of doing business and was, thus, a part of the total cost to the consumer included within the selling price and a part of gross receipts under 79-3606(a), upon which sales tax is collected. 262 Kan. at 231-32.

The City distinguishes the fees from the mandatory gratuity in *Newton Country Club* by arguing none of the fees must be paid to receive water, the fees are not paid on each quantity of water

purchased, the fees are not included in gross receipts of sales, water is not furnished with payment of these fees, the fee is separate on the customer's bill, payment does not pass title to any personal property, turn off fees need not be paid to receive water, and plant equity fees and fees in lieu of special assessment need not be paid to receive water, especially if they were paid by a developer or prior water user.

The City distinguishes this case from *Atchison Cablevision* because the statute, K.S.A. 1996 Supp. 79-3603(k), imposed a tax on the gross receipts from cable services, while the statute in this case imposes a tax on the gross receipts from the sale or furnishing of water under K.S.A. 1992 Supp. 79-3603(c). The City argues no evidence was presented that the fees are a mandatory charge for the sale or furnishing of water; rather, they are for the unrelated act of incidental services or collecting a portion of the capital costs for infrastructure.

The City's attempt to distinguish this case from *Atchison Cablevision* and *Newton Country Club* is without merit. Although K.S.A. 1992 Supp. 79-3603(c) does not include the term *service*, it imposes a tax on the *sale* of water. Sale is defined as "the exchange of tangible personal property . . . including the sale or furnishing of electrical energy, gas, water, *services*." (Emphasis added.) K.S.A. 1992 Supp. 79-3602(c).

Moreover, contrary to the City's argument, implicit in the furnishing or sale of water is the City's provision of these services. The testimony was clear that if the plant equity fee or fee in lieu of special assessment were not paid, even though they were a one time payment normally paid by the developer, water would not be furnished. Likewise, if the turn on/off, account origination, lawn connect, and priority service charges were not paid, the customer's water supply would be disconnected. The fact that these fees were listed separately on the bill makes this case more analogous to *Atchison Cablevision* and *Newton Country Club*, as the mandatory gratuity and the franchise fees were likewise listed separately.

The rationale of *Atchison Cablevision* and *Newton Country Club* applies to this case. As these fees must be paid, whether by the developer or the final customer, in order to establish or maintain

water from the City, they are part of the total cost to the consumer under K.A.R. 92-19-46. As such, they are included within the selling price under K.S.A. 1992 Supp. 79-3602(g) and are a part of gross receipts under K.S.A. 1992 Supp. 79-3603(a), upon which sales tax is collected. BOTA's determination is upheld.

## Computer Equipment

In the final determination letter, the Revenue Department assessed compensating use tax on the City's purchase of computer hardware and miscellaneous equipment used to upgrade its billing services. Hernandez testified that this upgraded equipment was necessary for the establishment and implementation of the storm water utility department established in 1992, which is separate from the water department and is not a taxable entity. The upgrade was necessary to handle the increased volume and data management of the storm water utility accounts and to allow merging with the water department and sewer department billing system.

Although the sewer department purchased this equipment, the storm water utility department reimbursed the sewer department for the entire purchase cost of the computer equipment. Hernandez explained that the water and sewer departments did not need this upgrade to continue their billing practices, and she concluded that the water department was not responsible for any of the cost of the upgraded equipment. However, this upgrade provides an integrated bill which reflects the charges for the storm water, sewer, and water departments on the same statement.

BOTA affirmed the Revenue Department's assessment, reasoning:

"The Board finds that billing is an essential function in business, including the business of furnishing water. Although the water department did not need and did not purchase the subject computer upgrade and equipment, the Board finds that the computer upgrade is actually used in part by or for the water department to assist in its billing function. As a result, the Board concludes that K.S.A. 79-3606(b), and amendments thereto, does not exempt the subject computer upgrade and equipment from compensating use tax, and the Department's assessment is sustained."

Discussion

K.S.A. 1992 Supp. 79-3703 imposes compensating use tax for the privilege of using, storing, or consuming in this state any article of tangible personal property. Pursuant to K.S.A. 1992 Supp. 79-3702(b), the exemptions within K.S.A. 1992 Supp. 79-3606 have full force and effect under the provisions of the Kansas Compensating Use Tax Act, K.S.A. 79-3701 *et seq.*

As discussed above, K.S.A. 1992 Supp. 79-3606(b)(2) provides that all sales of tangible personal property purchased directly by the State of Kansas or a political subdivision used exclusively for the political subdivision are exempt from sales tax except when the political subdivision is engaged in the business of furnishing water and the personal property or services are used in that business.

The City argues that the purchase of this specific equipment was for use by the political subdivision for efficiency in billing customers for the services of several departments in a single bill. It contends that because the water department already had adequate billing capability, it had no use for the integration hardware. Thus, the exclusive "use" of the computer equipment was billing integration by the political subdivision.

The City attempts to confuse the issue in this case by focusing on the "use" or the need for the property or services at the time of purchase. However, the question under K.S.A. 1992 Supp. 79-3606(b)(2) is not whether the computer equipment was purchased for the exclusive use of the political subdivision, but whether the political subdivision used the computer equipment in the business of furnishing water. It does not matter whether the water department actually needed the equipment to successfully bill its customers or for what purpose it was purchased; rather, it matters solely whether the water department used the equipment.

In this case, it is undisputed that the water department utilized this computer equipment to assist in its billing function, which the City concedes is an essential function of the business of furnishing water. Even though the equipment was used by other nontaxable departments, K.S.A. 1992 Supp. 79-3606(b)(2) does not require that the excepted use (furnishing water) be the exclusive use of the

tangible personal property or service in order for it to be disqualified from exemption. See *City of Wichita I,* 274 Kan. at 933. The political subdivision used the computer equipment in its business of furnishing water; BOTA properly concluded that the equipment did not qualify for an exemption under K.S.A. 1992 Supp. 79-3606(b).

## Abatement of Interest

In this case, BOTA found that the City was not entitled to an abatement of interest on the assessment of sales tax:

"74. For the Taxpayer to be entitled to the abatement of interest, the delay in assessing the tax must have resulted from the negligence of a Department employee. Black's Law Dictionary (6th Ed. 1991), defines negligence as, 'The omission to do something which a reasonable man, guided by those ordinary considerations which ordinarily regulate human affairs, would do, or the doing of something which a reasonable and prudent man would not do.' In this case, a delay in completing the assessment was caused by the retirement of the first auditor. Once a second auditor was assigned, the audit was completed in a timely manner. The Board finds that the Department assessed the subject tax by its Notices of Assessment dated February 5, 1996. Based upon the de novo record before this Board, the Board believes there was no negligence on the part of any employee of the Department [that] contributed to the delay in completing the assessment. The Board finds that the Taxpayer's request for an abatement of interest is denied.

"75. Further, the Board notes that essentially the Taxpayer's assertion is that there was an undue delay in the issuance of the final determination letter pursuant to K.S.A. 79-2975, not the Notices of Assessment. However, the Board finds that its jurisdiction is limited to a review of the director's waiver or nonwaiver of interest in this matter for a delay in the Notices of Assessment. 'The State Board of Tax Appeals is a creature of the Legislature. Its authority is only such as is expressly or impliedly given by legislative enactment. If it attempts to exercise jurisdiction over a subject matter not conferred by the Legislature, its orders with respect thereto are without authority of law and void.' *Walkenmeyer v. Stevens County Oil & Gas Co.,* 205 Kan. 486, 491, 470 P.2d 730 (1970) (citations omitted); *Vaughn v. Martell,* 226 Kan. 658, 603 P.2d 91 (1979). The Board finds that K.S.A. 79-3268(f), and amendments thereto, does not address a delay in the issuance of a written final determination. Absent any other statutory authority, the Board lacks jurisdiction to consider the specific interest issue raised by the Taxpayer."

In *City of Wichita I,* the City argued that it was entitled to an abatement of interest on the assessment of additional sales tax on

electricity. BOTA reached a verbatim conclusion as was reached in paragraph 74 in this case, but it did not make the findings set forth in paragraph 75. On appeal, the City argued that BOTA erred in finding no departmental evidence and it argued that BOTA failed to address the application of K.S.A. 79-3268(d) to "inordinate" delays in the administrative proceedings, specifically, the 3-year delay and statutory violations in issuing a final determination upholding the assessment.

On appeal, this court affirmed BOTA's conclusion:

"Before the Court of Appeals, the City argued that the audit began in September 1994 and was not complete until February 1996. However, the delay from the time Smith began his work on the audit until the time Blaha began her work on the audit affected the audit period itself. Thus, any delay gave the City the benefit of excluding 9 months, *i.e.*, 3 years before Smith began his audit (September 1991) until 3 years before Blaha began her audit (June 1, 1992), from the audit period. Regarding the time Blaha took to complete the audit, the City's attorney at the hearing before the ALJ remarked that the time was not unreasonable. The record supports BOTA's determination and there is no evidence which would support reversal of the negative finding that the Department's employees were not negligent in either assessing the tax or in notifying the taxpayer.

"The City complained about the 'inordinate time required to move this case through the administrative process.' The Department pointed out that the statutory language only contemplated delay in assessing the tax or notifying the taxpayer of the liability. The City fails to persuasively respond to the Department's argument that delays other than in assessing tax and notification of the taxpayer are beyond the reach of K.S.A. 79-3268(d). 'Ordinary words are to be given their ordinary meaning, and a statute should not be so read as to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it. [Citation omitted.]' *GT, Kansas, L.L.C. v. Riley County Register of Deeds*, 271 Kan. 311, 316, 22 P.3d 600 (2001). Without any statutory authority for extending K.S.A. 79-3268(d) to delays other than those plainly specified in that subsection, we decline to expand that subsection." *City of Wichita I*, 274 Kan. at 936-37.

## Discussion

The City argues that BOTA erred in denying the City an abatement of interest on any remaining tax due pursuant to K.S.A. 79-3268(d) of the Taxpayer Bill of Rights Act. The Revenue Department counters that the City should be collaterally estopped from

raising this issue because it was already decided in *City of Wichita I*. The Revenue Department's argument has merit.

K.S.A. 79-3268(d) provides: "The director shall waive any interest assessed against a taxpayer when it is determined by the director that the negligence of an employee of the department resulted in undue delay in either assessing tax or notifying the taxpayer of the liability owed."

"Whether the doctrine of issue preclusion or claim preclusion applies in a certain situation is a question of law. An appellate court may analyze the question using unlimited de novo review. [Citation omitted.]" *Stanfield v. Osborne Industries, Inc.*, 263 Kan. 388, 396, 949 P.2d 602 (1997), *cert. denied* 525 U.S. 831(1998).

" 'The requirements of collateral estoppel are (1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment.' " *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 1023, 58 P.3d 1284 (2002).

"The doctrine of collateral estoppel is different from the doctrine of res judicata. Instead of preventing a second assertion of the same claim or cause of action, the doctrine of collateral estoppel prevents a second litigation of the same issues between the same parties or their privies even in connection with a different claim or cause of action." *Williams v. Evans*, 220 Kan. 394, Syl. ¶ 1, 552 P.2d 876 (1976).

The City first contends that BOTA erred in finding that no negligence delayed the audit because the audit spanned 19 months and the performance of the two auditors was not "reasonable" or "prudent" under the circumstances. However, the *City of Wichita I* court clearly rendered a prior judgment on this precise issue; the parties are identical; and the issue was litigated, determined, and necessary to support the judgment. Under these circumstances, the City is collaterally estopped from arguing that the audit was delayed by negligence warranting an abatement of interest.

The City also argues that BOTA misconstrued K.S.A. 79-3268(d) in concluding that the statute did not address a delay in the issuance of a final determination letter. The City contends BOTA's conclusion that initial notices of assessment are the only notifica-

tions subject to this statute was without support, unduly technical, and contrary to the spirit of the Taxpayer Bill of Rights Act.

The City did not raise these points in *City of Wichita I* when it was arguing about the inordinate delays in the administrative proceedings. These arguments appear to be a response to this court's finding in *City of Wichita I* that the City failed to persuasively respond to the Revenue Department's argument that delays other than in assessing tax and notification of the taxpayer were beyond the reach of K.S.A. 79-3268(d).

We have already reached a prior judgment on this issue in *City of Wichita I* where the parties were exactly the same and the issue was litigated and necessary to support the court's denial of an abatement of interest. The City had the opportunity but chose not to raise this particular supporting argument when this precise issue was raised in *City of Wichita I*. Under these circumstances, the City is likewise collaterally estopped from raising new arguments to support its position on this issue when the issue has already been decided in the Revenue Department's favor.

## Attorney Fees

In *City of Wichita I*, the City sought attorney fees and costs pursuant to K.S.A. 79-3268(f), and BOTA found that it did not have jurisdiction to award attorney fees in its August 29, 2000, order denying reconsideration:

"In regard to the Taxpayer's request for attorney's fees and related costs, the Board finds no express statutory grant of power that authorizes the Board to grant a request for attorney's fees. 'The State Board of Tax Appeals is a creature of the Legislature. Its authority is only such as is expressly or impliedly given by legislative enactment. If it attempts to exercise jurisdiction over a subject matter not conferred by the Legislature, its orders with respect thereto are without authority of law and void.' [Citations omitted.] 'No power has ever been delegated to this [B]oard to adopt or determine laws contrary to express statutory provisions. Any such attempted delegation of power would be [an] unlawful delegation of power and not binding on this court.' "

The City appealed this decision, and the Court of Appeals affirmed, reasoning:

"Taxpayer also claims it is entitled to attorney fees and costs. Without deciding whether BOTA has the statutory authority to grant a request for attorney fees, we

hold Taxpayer is not entitled to attorney fees and costs in this case, as we are unable to hold the Department of Revenue made its assessment without a reasonable basis in law and fact. See K.S.A. 79-3268(f)." *In re City of Wichita*, No. 85,953, unpublished opinion filed November 2, 1001.

This court affirmed the Court of Appeals' denial of attorney fees and costs:

"The Court of Appeals, in this case, determined the City was not entitled to attorney fees and costs because, citing K.S.A. 79-3268(f), it could not determine that the Department 'made its assessment without a reasonable basis in law and fact.' Unlike the Court of Appeals, we affirm the BOTA decision. Thus, in light of our conclusion, we find that attorney fees are even less appropriate in this case and affirm the Court of Appeals' denial of attorney fees and costs." 274 Kan. at 938.

In this case, BOTA likewise denied the City's request for attorney fees:

"80. K.S.A. 79-3268(f), and amendments thereto, explicitly requires that the taxpayer first exhaust its administrative remedies before an award of attorney fees may be made under the section. The Board finds that the Taxpayer has not yet exhausted its administrative remedies in this matter. A final order from this Board is required for administrative remedies to be exhausted. See *In the Matter of the Application of Reno Township*, 27 Kan. App. 2d 794, 10 P.3d 1 (1999). The Board concludes that it lacks jurisdiction to award attorney fees in this matter pursuant to K.S.A. 79-3268(f), and amendments thereto."

BOTA made no additional finding on this issue when ruling on the City's motion for reconsideration even though the motion argued that the administrative remedies were exhausted with that step.

BOTA member David L. Patton dissented from the majority's decision, reasoning that regardless of whether K.S.A. 79-3268(f) was applicable, BOTA has awarded attorney fees as sanctions in the past in *In re Tax Appeal of American Restaurant Operations*, 264 Kan. 518, 957 P.2d 473 (1998). He reasoned:

"The issue in this case is not necessarily the negligence by the Department of Revenue, although there is ample testimony to that fact, but a deliberate delay in the processing of the case by the Department, which damaged the City. Therefore, the award of attorney fees and expenses outlined in the City's Proposed Findings

of Fact and Conclusions of Law are justified and should be awarded to the City in the amount of $189,667."

Discussion

The City first argues that BOTA's interpretation of K.S.A. 79-3268(f) effectively requires the taxpayer to perfect a judicial review proceeding in order to be eligible for a fee award, which is not a practical or taxpayer-friendly construction of the Taxpayer Bill of Rights Act.

K.S.A. 79-3268(f) provides:

"Attorney fees and related expenses may be awarded to a taxpayer if it can be proved that an assessment or claim asserted by the department is without a reasonable basis in law or fact. A taxpayer must first exhaust its administrative remedies before an award of attorney fees may be made under this section."

When a statute is plain and unambiguous, the court must give effect to the legislature's intent as expressed in the language of the statute rather than determine what the law should be. In construing statutes and determining legislative intent, it is presumed that the legislature understood the meaning of and intended the words used and that the legislature used the words in accordance with their ordinary and common meaning. *In re Care & Treatment of Searcy*, 274 Kan. 130, 49 P.3d 1 (2002). Interpretation of a statute is a question of law, and this court's review is unlimited. *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

The plain and unambiguous language of K.S.A. 79-3268(f) provides that administrative remedies must be exhausted before attorney fees can be awarded under this statute. As such, any request for fees at the administrative level is premature as the administrative remedies were not exhausted until a final order was issued by BOTA on the motion for reconsideration. BOTA's determination that it was without jurisdiction to award attorney fees under K.S.A. 79-3268 was correct.

The City next argues that if BOTA's construction of K.S.A. 79-3268 is upheld, this court must determine whether attorney fees are appropriate in this case. The City points to six assessments and claims it argues were made by the Revenue Department without

basis in fact or law: (1) the claim that various fees for service charged by the City were collected for "the sale or furnishing of water," (2) the assessment of retailers' sales tax on interdepartmental transfers, (3) the assessment of electricity purchases at the full 4.9% rate, (4) the assessment of electricity consumed in production at 4.9% after *In re Appeal of Water Dist. No. 1 of Johnson County*, 26 Kan. App. 2d 371, 988 P.2d 267, *rev. denied* 268 Kan. 846 (1999), was filed, (5) the failure to issue a final determination until after final argument before Secretary Pierce contrary to the 270-day time limit of K.S.A. 2003 Supp. 79-3226(a), and (6) the claim that the June 30, 2002, final determination was based upon reconsideration of all the facts and issues underlying the assessment, given administrative law judge Heinemann's admission that it was merely to provide the Revenue Department's position.

The Revenue Department responds that the City should be collaterally estopped from relitigating this issue, as *City of Wichita I* was unable to hold that the Revenue Department made its assessment without a reasonable basis in law and fact. The Revenue Department contends that the City is not really arguing that the assessment was without a reasonable basis in law and fact, as it did not appeal all of the assessment but it simply disagrees with the arguments or positions put forward by the Revenue Department in support of its assessment.

As in *City of Wichita I*, this court affirms BOTA's order affirming the assessment by the Revenue Department. As such, the Revenue Department did not make its assessment without a reasonable basis in both law and fact, and the City is not entitled to attorney fees under K.S.A. 79-3268(f).

The City also cites *American Restaurant* as alternative authority for the award of attorney fees in this case. In that case, this court affirmed BOTA and the district court's award of discovery sanctions, including attorney fees, pursuant to K.S.A. 60-237, for the costs of the motion to compel discovery filed by the taxpayer. 264 Kan. at 538-39. However, *American Restaurant* and its statutory authority were inapplicable to this case because they dealt with sanctions for discovery violations rather than the length of the ad-

ministrative proceedings, which is at issue in this case. We conclude that BOTA's order denying attorney fees be upheld.

Protective Order

On February 26, 2001, the City filed a request for production of documents. On March 28, 2001, the Revenue Department filed a response objecting to certain documents on the grounds of attorney-client privilege, executive privilege, and quasi-judicial administrative privilege. On March 29, 2001, BOTA ordered the Revenue Department to produce the documents, and the Revenue Department complied.

On April 5, 2001, the Revenue Department filed a motion asking BOTA to issue a protective order covering certain documents and deposition testimony of hearing officers David Heinemann, Douglas Hager, and Secretary of Revenue Karla Pierce it had provided to the City. The Revenue Department cited no authority for this motion; it merely argued that the information was confidential and privileged.

The City opposed the motion, arguing that no legal authority existed to protect these documents, that the public interest overwhelmingly outweighs protection under these circumstances, and that the Revenue Department was seeking to cover up its own illegal acts from public scrutiny. On April 10, 2001, BOTA held oral arguments on the motion. The Revenue Department argued that disclosure of these materials to the public would have a chilling effect on the administrative decision-making process.

After the hearing, the Revenue Department filed a response that it was asserting quasi-judicial administrative privilege, executive privilege, governmental deliberative process privilege, and attorney-client privilege, and it cited the Kansas Open Records Act (KORA), K.S.A. 45-215 *et seq*. The City filed a supplemental memorandum in response reiterating that the motion failed to state the factual or legal basis for a protective order and that a general claim of privilege does not entitle the Revenue Department to a protective order under K.S.A. 2003 Supp. 60-226.

BOTA entered a protective order regarding the following documents: (1) 10/20/97 email from Douglas Hager to John LaFaver

at 4:13 p.m.; (2) 3/6/96 memo from Tom Sheridan to LaFaver; (3) 1/24/96 memo from Sheridan to Wayne Vennard; (4) 11/10/97 email from Hager to LaFaver at 12:52 p.m. and the 11/11/97 response at 10:16 p.m.; (5) 10/28/97 memo from Hager to LaFaver including 6 Post-It notes containing internal working notes; (6) 10/10/97 unsigned draft of the final determination; (7) 6/28/00 email from Richard Cram to David Heinemann at 10:06 a.m.; (8) 10/23/97 email from Hager to LaFaver at 12:42 p.m. and reply emails on 10/24/97 at 8:14 a.m. and 12:04 p.m; (9) 4/1/97 Hager hearing notes; (10) 3/27/97 and 3/28/97 Hager hearing notes; (11) 3/20/97 Hager internal working notes; (11) undated Heinemann internal working notes; and (12) undated LaFaver internal working notes.

BOTA explained its reasoning for the protective order:

"8. Pursuant to K.S.A. 60-226(c), and amendments thereto, the Board may issue a protective order upon the motion of a party and for good cause shown. The Department has filed a motion for a protective order requesting that the disclosure of clearly identified documents be limited to the parties and the Board until the Board has had an opportunity to rule on the issues of privilege and admissibility of the documents. Further, the Department cites the Kansas Open Records Act.

"9. As stated in the Kansas Open Records Act, the public policy of the state of Kansas is that 'public records shall be open for inspection by any person unless otherwise provided by this act, . . .' K.S.A. 45-216(a). However, the act acknowledges that certain records are not required to be open. K.S.A. 45-221(a)(2) states that a public agency is not required to disclose '[n]otes, preliminary drafts, research data in the process of analysis, unfunded grant proposals, memoranda, recommendations or other records in which opinions are expressed or policies or actions are proposed, except that this exemption shall not apply when such records are publicly cited or identified in an open meeting or in an agenda of an open meeting.' The Board finds that there is sufficient detailed information before the Board to conclude that the documents at issue in this motion would qualify as notes, preliminary drafts, memoranda or recommendations in which opinions of actions are proposed.

"10. The Board finds that under the Kansas Open Records Act the documents at issue would not have to be produced if requested by an unrelated third party to this matter. In its discretion, the Board finds that this fact constitutes good cause to issue a protective order. The Board finds that pursuant to K.S.A. 77-522, K.S.A. 60-226(c), and K.A.R. 94-2-14, the Board has the authority to issue a protective order. Further, the Board finds that a protective order should be entered."

BOTA Chairman David Patton dissented from the majority opinion:

"The majority has further alluded to the Kansas Open Records Act. The Kansas Open Records Act has no application in this case since the records have in fact been produced without objection.

"The Department has totally failed to provide good cause in support of a protective order. . . .

"Upon review of the Department's original Motion for Protective Order, oral arguments, and Reply, the Department has failed to show good cause pursuant to statute why a protective order should be issued. The Department has not shown that a protective order is necessary to protect the Department from annoyance, embarrassment, oppression, or undue burden or expense, and the Department's motion should be denied."

## Discussion

The control of discovery in Kansas is entrusted to the sound discretion of the district court, K.S.A. 60-226(c) and K.S.A. 60-237(a)(2), and orders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion. *Lone Star Industries, Inc. v. Secretary of Kansas Dept. of Transp.*, 234 Kan. 121, 131-32, 671 P.2d 511 (1983).

K.S.A. 77-522(a) grants the presiding officer the authority to issue subpoenas, discovery orders, and protective orders in accordance with the rules of civil procedure.

K.S.A. 2003 Supp. 60-226(c) provides in relevant part:

"Protective orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

K.A.R. 94-2-14(a)(2) provides that the following criteria shall be considered by BOTA when ruling on a motion for a protective order for confidential business records: "(A) [w]hat risk of financial or competitive harm to the party seeking to prevent disclosure faces; (B) whether or not disclosure will aid the board in its duties; (C) whether or not disclosure serves or might harm the public

interests; and (D) whether or not alternatives to full disclosure exist."

An interesting preliminary question arises as the City did not suffer any harm by the protective order issued by BOTA. The City had access to all of the information and has been free to use it throughout the proceedings before BOTA and this court. At the hearing, BOTA member Jill Jenkins asked the City's counsel if the City would be harmed in any way if BOTA were to grant the Revenue Department's motion, and counsel responded:

"Well, it's an excellent question, and I would say that the harm to my client in this case would be difficult to cite to you. In other words, as long as this Board will review these documents in connection with the issues in this case and in the Court of Appeals in their case, then in terms of this limited proceeding, we don't talk about harm. But, you know, what I think is before the Board really, Ms. Jenkins, is beyond that. It's sort like well, what about my client in future cases? What happens the next time that they have to go through the Department of Revenue on a case that they have to be embroiled in an administrative hearing at the Department of Revenue level? Are they harmed because they're still stuck with that old procedure and the way it works I would argue, yes. You know, really the principal harm of the Board's—of a conscious approach here and saying let's just keep the lid on this is really more to the taxpayers across the State of Kansas, of which my client is only one. It's time to clean it up down there, and we will all be harmed if that doesn't happen. In that sense we stand with all other taxpayers but not specific to this case."

Where the parties have conflicting interests in material sought to be discovered, the protective power of the court may be sought by a party and the court must balance the litigant's interest in obtaining the requested information with the resisting party's interest, as well as the public interest in maintaining the confidentiality of the material. When a trial court orders production of confidential records, it has a duty to limit the availability and use of documents by carefully drawn protective provisions. *Wesley Medical Center v. Clark*, 234 Kan. 13, Syl. ¶¶ 13, 14, 669 P.2d 209 (1983).

In this case, BOTA clearly balanced the City's need to have these documents with the Revenue Department's assertions of privilege and the chilling effect their disclosure would have on the administrative process by crafting a protective order which resulted in no

prejudice to either party *in this case*. The City would be able to use all of the information, and the Revenue Department would not suffer the embarrassment of having it disseminated to the public.

Ultimately, it appears from the record that the City asks this court to decide this issue as a matter of principle, a question which will have no effect on the outcome of this case. We decline the request. We are reminded that

" 'it is the duty of the courts to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles which cannot affect the matters in issue before the court.' " *In re Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, 305, 14 P.3d 1099 (2000) (quoting *Miller v. Sloan, Listrom, Eisenbarth & Glassman*, 267 Kan. 245, 262, 978 P.2d 922 [1999]); accord *Burnett v. Doyen*, 220 Kan. 400, 403, 552 P.2d 928(1976).

Should a question relating to KORA arise in another context, there is nothing to prevent the court from giving it consideration.

Affirmed.